Tom SWINT; Tony Spradley; Drecilla James and Jerome Lewis, Plaintiffs–Appellees,

v.

The CITY OF WADLEY, ALABAMA; Freddie Morgan and Gregory Dendinger in their official and individual capacities; Chambers County Commission, Defendants–Appellants,

Chambers County Sheriff's Department, Defendant,

James C. Morgan, in his official and individual capacity, Defendant–Appellant.

No. 92–6574.

United States Court of Appeals, Eleventh Circuit.

Nov. 3, 1993.

---

Ernest Sapp and Fred D. Gray, Tuskegee, AL, for City of Wadley, Ala., et al.

Kendrick E. Webb, Bart Harmon, and Roy W. Granger, III, Montgomery, AL, for JCM, et al.

Carlos A. Williams, Mobile, AL, for plaintiffs-appellees.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and BRIGHT*, Senior Circuit Judge.

CARNES, Circuit Judge:

This civil rights case, involving allegations of police misconduct, was filed by four citizens against the City of Wadley, Alabama, the Chambers County Commission, and three individual defendants: Wadley Police Chief Freddie Morgan, Officer Gregory Dendinger, and Chambers County Sheriff James C. Morgan. Before us is the appeal of Chief Morgan, Officer Dendinger, and Sheriff Morgan from the district court's denial of their qualified immunity summary judgment motions. Also before us is the request by the City of Wadley and the Chambers County Commission that we exercise jurisdiction under either the collateral order or pendent appellate doctrines to review the district

---

* Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

court's denial of their summary judgment motions. The City contends the district court should have held that the Chief of Police did not have final decisionmaking authority over the relevant actions, and thus the City was not liable for his conduct. Similarly, the County Commission contends the court should have held that under Alabama law the Sheriff was not the final repository of county law enforcement authority, and thus the County was not liable for his actions. The City, Chief Morgan, and Officer Dendinger also urge us to review, under either the collateral order or pendent appellate jurisdiction doctrine, the district court's denial of their summary judgment motion as to the state law claims against them.

We affirm the district court's denial of the individual defendants' qualified immunity summary judgment motions insofar as the Fourth Amendment and equal protection claims are concerned, but reverse the denial as to the due process claims. We exercise our pendent appellate jurisdiction over and reverse the denial of the County Commission's summary judgment motion. We hold that jurisdiction to review the rulings on the denial of the other motions for summary judgment does not exist under the collateral order doctrine, and we decline to exercise pendent appellate jurisdiction to review those rulings.

## I. BACKGROUND

### A. STATEMENT OF FACTS

In considering the denial of a defendant's summary judgment motion, we are required to view the facts, which are drawn from the pleadings, affidavits, and depositions, in the light most favorable to the plaintiffs. *E.g., Hardin v. Hayes,* 957 F.2d 845, 848 (11th Cir.1992); *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990). Any qualified immunity defenses that do not result in summary judgment before trial may be renewed at trial, where the actual facts will be established. *Compare Adams v. St.*

*Lucie County Sheriff's Dep't,* 962 F.2d 1563, 1567 n. 2 (11th Cir.1992) (non-majority opinion of Hatchett, J.) (dictum) *with id.* at 1579 n. 8 (dissenting opinion of Edmondson, J.) (dictum).[1] Thus, what we state as "facts" in this opinion for purposes of reviewing the rulings on the summary judgment motions may not be the actual facts. They are, however, the facts for present purposes, and we set them out below.

This lawsuit stemmed from two law enforcement raids on the Capri Club ("the Club"), a nightclub located in Chambers County, Alabama. Although outside any city limits, the Club is within the police jurisdiction of the City of Wadley, a community located in Randolph County, Alabama. Plaintiffs Tom Swint and Tony Spradley are owners of the Club; plaintiff Drecilla James is a Club employee who was present during both of the raids; Jerome Lewis is a Club patron who was present during the second raid. All four plaintiffs are black. The three individual defendants—Chief Morgan, Officer Dendinger, and Sheriff Morgan—are all white. Each was sued in both his official and individual capacities. The Chambers County Commission and the City of Wadley are the other defendants.

In response to complaints that drug transactions were being conducted in the Club, the Chambers County Sheriff's Department and the City of Wadley Police Department engaged in a preliminary narcotics investigation of the Club. This investigation culminated in a recommendation from Chambers County Sheriff's Investigator Timothy Birchfield to Sheriff Morgan for a raid on the Club. Sheriff Morgan "approved the narcotics investigation and operation at the Club."

The raid was conducted by the Chambers County Drug Task Force, consisting of units from the Chambers County Sheriff's Department and the police departments of the cities of Lafayette, Lanett, and Valley, Alabama. Joining the Task Force for this operation were representatives of the City of Wadley

---

1. No majority opinion was issued by the panel in *Adams.* Two of the panel members did concur in the judgment affirming the denial of summary judgment on qualified immunity grounds. Judge Edmondson dissented. The en banc court reversed, "[o]n reasoning set out in the dissenting opinion of Judge Edmondson." *Adams v. St. Lucie County Sheriff's Department,* 998 F.2d 923 (11th Cir.1993) (en banc) (per curiam).

Police Department and the Alabama Alcoholic Beverage Control Board. The total strength assembled by the Task Force for the raid was 30 to 40 law enforcement officers. In accordance with the operation plan apparently devised by Investigator Birchfield, an undercover officer and a confidential informant entered the Club on December 14, 1990 while the other task force members remained out of sight. While inside, the undercover officer was offered marijuana and crack cocaine for sale by a patron of the Club. After purchasing these drugs, the officer left the Club and signaled for the raid to begin.

Initial entry of the Club was made by the City of Lanett, Alabama, SWAT team consisting of approximately eight officers. The team was dressed in black and at least some of the members wore ski masks to conceal their identities. Within 30 seconds of the SWAT team's entry, the other members of the task force entered. The person who had sold the undercover officer drugs was identified and arrested. The task force officers pointed their weapons at plaintiffs Spradley and James and others who were present. Participants in the raid searched the Club's cash register and door receipts, and some currency was confiscated from the door receipts. Persons inside the Club were prohibited from moving or leaving until the raid, which lasted one to one and one-half hours, was over. Those present were not allowed to go to the restroom. When one man asked for permission, Officer Dendinger replied, "Shut up, or I'll shut you up myself." When plaintiff James told Chief Morgan that she was so scared that she had to go to the restroom, he said no. Another officer also refused her request to use the Club's restroom facilities, telling her she would have to go behind the building. During this first raid, illegal liquor was seized by an Alabama Alcohol Beverage Control Board officer who participated in the raid, and several minors were found inside the Club. Only two people were arrested during this entire raid: the man who sold the undercover officer drugs; and that man's younger brother, a minor, who had in his possession some of the marked money the undercover agent had paid for the drugs.

After the December 14, 1990 raid, additional narcotics-related complaints were received by the Chambers County Sheriff's Department. In response, Sheriff Morgan directed that Birchfield investigate activities at the Club to ascertain whether a second operation was required. Birchfield investigated and recommended another operation; Sheriff Morgan authorized it.

The second raid was conducted on March 29, 1991, and it was virtually identical in procedure to the first. Again, an undercover agent went inside first and purchased drugs. After the premises were secured this time, however, the task force participants could not find the man who had sold drugs to the undercover officer. During this second raid, law enforcement officials chambered rounds of ammunition into their weapons, pointed them, and ordered persons in the Club to get down on the floor. Some of those present in the Club during this raid were searched, including plaintiff Lewis. During the process of being searched, Lewis was pushed outside the Club, grabbed, and shoved against a wall. After being searched, Lewis was forced to go back inside the Club until the raid was concluded. Another patron was pushed off a bar stool. Some of the employees, including plaintiff James, had guns held on them during this raid, which lasted from one to one and one-half hours. At one point, an officer, with his finger on the trigger, pointed a shotgun at Lewis' face. No one was arrested during or because of this second raid.

During one of the raids, an unidentified officer said they would be coming back and would not stop until the Club was closed. No other law enforcement operation of this nature had been conducted during Sheriff Morgan's twenty-one year tenure as Sheriff of Chambers County. Chief Morgan and Officer Dendinger personally participated in both raids. Sheriff Morgan was not physically present during either raid, but he authorized both of them.

## B. COURSE OF PROCEEDINGS

The plaintiffs' complaint, which seeks declaratory, injunctive, and compensatory re-

lief, avers the following four counts [2]:

> Count I: Deprivation of Civil Rights, 42 U.S.C. §§ 1981, 1983 and 1985 for violations of plaintiffs' rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments;
>
> Count II: Conspiracy to deny plaintiffs' constitutional rights;
>
> Count III: Pendent state claims alleging assault and false imprisonment;
>
> Count IV: Pendent state claims alleging negligence.

All the defendants moved to dismiss, and their motions were granted in part and denied in part by the district court. Citing *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the district court dismissed the 42 U.S.C. § 1981 claims against all defendants. The court dismissed on Eleventh Amendment grounds the claims against Sheriff Morgan in his official capacity to the extent plaintiffs seek money damages. The court also dismissed the complaint against the Chambers County Sheriff's Department. None of those dismissals is before us for review.

All remaining defendants filed motions for summary judgment. In response, the district court granted judgment against the plaintiffs as follow:

> 1. On Count I insofar as the plaintiffs claimed a right under the Sixth Amendment to be informed of the accusations against them;
>
> 2. On Count II insofar as the plaintiffs claimed a right to association, speech and movement;
>
> 3. On Counts III and IV as to the Chambers County Commission;
>
> 4. On Count III as to Sheriff Morgan;
>
> 5. On Count III as to the City on the claims of false imprisonment only; and
>
> 6. On Count IV as to Officer Dendinger.

In all other respects, the defendants' motions for summary judgment were denied.

**2.** In the introduction to their complaint, plaintiffs refer to a violation of their rights guaranteed under the Thirteenth Amendment. However, plaintiffs indicated in a pretrial conference that they would not pursue the Thirteenth Amendment claim; the district court, therefore, regarded this claim as abandoned and declined to address it. So do we.

## II. DISCUSSION

### A. THE INDIVIDUAL DEFENDANTS' APPEAL OF THE DENIAL OF SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS

#### 1. *Qualified Immunity Law*

The district court denied the three individual defendants' motions for summary judgment on qualified immunity grounds. The denial of qualified immunity is a question of law to be reviewed *de novo*. *Hardin v. Hayes*, 957 F.2d 845, 848 (11th Cir.1992). In addition, "when a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiff." *Id.* The rudiments of the qualified immunity defense are well established:

> When a plaintiff sues a municipal officer in the officer's individual capacity for alleged civil rights violations, the plaintiff seeks money damages directly from the individual officer. If sued "individually," a municipal officer may raise an affirmative defense of good faith, or "qualified," immunity.

*Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991) (citations omitted). The test for qualified immunity was announced by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

> [G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738.

Although the cases sometimes refer to the doctrine of qualified "good faith" immunity, the test is one of objective 'legal reasonableness, without regard to whether the government official involved acted with subjective good faith. *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir.1991). "[W]e look to whether a reasonable official

could have believed his or her conduct to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." *Hardin,* 957 F.2d at 848. Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Courson,* 939 F.2d at 1487 (*quoting Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

In conducting the objective legal reasonableness inquiry, this Court has defined the following framework for analysis:

> In *Zeigler v. Jackson,* [716 F.2d 847, 849 (11th Cir.1983),] this Court established a two-step analysis to be used in applying the *Harlow* test: the defendant government official must prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," and then the burden shifts to the plaintiff to demonstrate that the defendant "violated clearly established constitutional law."

*Sammons v. Taylor,* 967 F.2d 1533, 1539 (11th Cir.1992). The plaintiffs do not contest that the individual defendants were acting within their discretionary authority when they authorized or participated in the two raids. Thus, the first step of the analysis is satisfied.

The dispute is over the second step of the analysis: whether the rights alleged to have been violated were "clearly established" law at the time of the action. The Supreme Court has revisited this question a number of times:

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). This Court has previously explained:

> [T]here are two questions of law that we must decide in completing the second step of the *Zeigler* analysis: ascertainment of the law that was clearly established at the time of the defendant's action, and a determination as to the existence of a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights established by that clearly-established law.

*Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir.1988). The *Rich* Court elaborated on the "common situations" that can arise in connection with the "clearly established" inquiry:

> The parties can in a given case make factual showings regarding the acts or omissions of the defendants which create genuine fact issues as to precisely what the defendant's course of conduct was in the given situation. However, these factual disputes do not preclude a grant of summary judgment premised on a defendant's qualified immunity if the legal norms allegedly violated were not clearly established at the time of the challenged actions. Thus, in the context of a § 1983 case, summary judgment would be appropriate as a matter of law, notwithstanding factual disputes on the record regarding the defendant's conduct.

*Id.* at 1564–65. The Court went on to discuss the flip side of this coin:

> To complete the point made here, we also recognize that if the legal norms allegedly violated were as a matter of law clearly established at the appropriate time, a genuine fact issue as to what conduct the defendant engaged in would preclude a grant of summary judgment based upon qualified immunity. In this latter situation the denial or grant of summary judgment turns on the second question of law identified in *Mitchell* [*v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ], i.e., do the showings reveal a genuine issue of material fact as to whether the defendant's conduct violated the right accruing to the plaintiff under clearly established law.

*Id.* at 1565.

### 2. The Constitutional Norms Relied Upon By Plaintiffs

The district court granted defendants' summary judgment on qualified immunity

grounds as to the First and Sixth Amendment claims, but denied it as to the Fourth Amendment, due process, and equal protection claims, concluding "that the law was clearly established in December, 1990, and in March, 1991" that the alleged conduct violated those constitutional provisions.

### a. The Fourth Amendment Claims

■ The district court found that it was "clearly established ... that a raid of a business establishment violates the Fourth Amendment unless based on probable cause and exigent circumstances...." Indeed it was. Well before the events of December 1990 and March 1991, this Court observed:

> The basic premise of search and seizure doctrine is that searches undertaken without a warrant issued upon probable cause are *"per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."

*United States v. Alexander,* 835 F.2d 1406, 1408 (11th Cir.1988) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). Long before the raids at issue in this case, the Supreme Court, summarizing preexisting law, noted that "[a]bsent consent or exigent circumstances, a private home may not be entered to conduct a search or effect an arrest without a warrant." *Donovan v. Dewey,* 452 U.S. 594, 598 n.6, 101 S.Ct. 2534, 2538 n. 6, 69 L.Ed.2d 262 (1981). The Court specifically added that "these same restrictions pertain when commercial property is searched for contraband or evidence of crime." *Id.* Our cases have stressed that:

> [o]nly in the face of "exigent circumstances," where obtaining a warrant would greatly compromise important law enforcement objectives, does the warrant requirement yield. When exigent circumstances coexist with probable cause, the Fourth Amendment has been held to permit warrantless searches and seizures.

*United States v. Pantoja–Soto,* 739 F.2d 1520, 1523 (11th Cir.1984) (citations omitted), *cert. denied,* 470 U.S. 1008, 105 S.Ct. 1369, 84 L.Ed.2d 389 (1985).

■ Defendants argued before the district court that "[t]he search in the case here was pursuant to probable cause and exigent circumstance[s]...." Probable cause, a pure question of law, "exists when under the 'totality-of-the-circumstances ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.) (en banc) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)), *cert. denied,* —— U.S. ——, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991). In other words, "facts [which would] lead a reasonably cautious person to believe that the 'search will uncover evidence of a crime'" will support a finding of probable cause. *United States v. Burgos,* 720 F.2d 1520, 1525 (11th Cir.1983) (quoting *United States v. Rojas,* 671 F.2d 159, 165 (5th Cir. Unit B 1982)).

■ Nonetheless, the question for purposes of the individual defendants' qualified immunity defense is not whether probable cause actually existed. Instead, "[w]hen a law enforcement officer seeks summary judgment on the basis of qualified immunity, we only must ask whether, viewing the facts in a light favorable to the non-movant, there was *arguable* probable cause." *Moore v. Gwinnett County,* 967 F.2d 1495, 1497 (11th Cir. 1992) (emphasis in original), *cert. denied,* —— U.S. ——, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993). Thus, we determine "whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed." *Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990); *accord Moore,* 967 F.2d at 1497–98. In *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court acknowledged that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... that in such cases those officials ... should not be held personally liable." *Id.* at 641, 107 S.Ct. at 3039–40; *accord Von Stein,* 904 F.2d at 579.

■ Based on the record before us, read in a light favorable to the plaintiffs, we cannot conclude that the individual defendants

had even arguable probable cause to conduct the extensive raids of the Club, which included a search of the premises, the seizure of all employees, patrons, and owners present, and the search of some of those who were detained. Stated somewhat differently, law enforcement officers in the position of these individual defendants could not reasonably have concluded that adequate probable cause existed to justify the searches and seizures that occurred. Chief Morgan testified in deposition that approximately a month before the first raid, he had received information from a reliable confidential informant regarding the sale of narcotics inside the Club. Chief Morgan noted that this source had previously assisted authorities in obtaining convictions of other suspects. According to Chief Morgan, the informant identified several individuals allegedly involved in the sale of drugs. Likewise, Sheriff Morgan testified that he relied on information from a reliable informant in authorizing the March 29, 1991 raid. However, none of those persons identified by these informants were owners or employees of the Club; therefore, the search of the Club's cash register and door receipts was presumptively unreasonable. Moreover, the defendants have offered no evidence that all of the patrons of the Club who were detained at gunpoint and randomly searched were previously identified as engaged in the narcotics trade, or that the defendants had any reason whatsoever to believe that all of the patrons were involved in illegal activity. Absent such evidence or reason to believe, there was not even arguable probable cause to seize and detain every patron and employee of the Club for an hour and a half and search many of those present.

Defendants direct our attention to the consummated drug transactions that preceded each of the raids. Immediately before each raid, an undercover agent did complete a single drug buy from one person inside the Club. There is no question that probable cause existed to arrest and search the narcotics peddler on each of the two occasions. Within minutes of the entry of the SWAT team and other members of the task force at the beginning of the December 14, 1990 raid, the drug seller was identified, arrested, and removed from the premises. After entry

during the March 29, 1991 raid, officers attempted in vain to identify and find the one who had sold drugs to the undercover officer a few minutes earlier. If that had been the extent of the intrusion on these two occasions, this would be a different case. But that was not the end of the intrusion. On the contrary, the officers proceeded to detain at gunpoint dozens of citizens for an hour and a half, search a number of them, and search the premises as well. In the process, the officers completely disrupted the business of the Club. All of this was done without even arguable probable cause to justify anything beyond the search and arrest of a single individual on each occasion.

■ Defendants have cited no authority that even suggests that the search and seizure of one suspect in a public place can be bootstrapped into probable cause for a broad-based search of the business establishment and its patrons. More than a decade before the raids in this case, the Supreme Court clearly established the constitutional impropriety of what was done in this case. In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Illinois Bureau of Investigation obtained a search warrant authorizing the search of the Aurora Tap Tavern and of the person of the bartender. In the ensuing search, one officer proceeded to pat down each of the nine to thirteen customers in the tavern. In the course of the patdown of patron Ventura Ybarra, heroin was found. The Supreme Court reversed the resulting conviction on Fourth Amendment grounds with an observation that could have been penned for this case as well: "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 100 S.Ct. at 342. The Fourth Amendment, declared the Court, affords "individualized protection":

Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search

or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.

*Id.* (Citing *Rakas v. Illinois,* 439 U.S. 128, 138–43, 148–49, 99 S.Ct. 421, 427–30, 433, 58 L.Ed.2d 387 (1978); *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)). Each citizen is "clothed with constitutional protection against an unreasonable search or an unreasonable seizure," *id.,* and does not shed that protection at the door of the Tap Tavern in Aurora, Illinois, or at the door of the Capri Club in Wadley, Alabama. Probable cause to arrest one suspect, and even probable cause to believe that a number of other or unidentified people had sold drugs in the establishment in the past, did not give the officers *carte blanche* to seize everyone who happened to be in the Club when the two raids took place.

We believe it was equally clear in December of 1990 that the arrest of the one person who had sold drugs to the undercover officer did not entitle the officers to search the entire premises in which he was located. The permissible scope of searches incident to arrests was defined by the Supreme Court in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969):

> Application of sound Fourth Amendment principles to the facts of this case produces a clear result. The search here [of the defendant's entire home subsequent to his arrest] went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area.

*Id.* at 768, 89 S.Ct. at 2043. The defendants had no warrant to search the Club and seize its occupants; they lacked even arguable probable cause to engage in such conduct; and their activities exceeded the bounds of a lawful search incident to an arrest. Under law that had been clearly established years before, the actions alleged to have occurred during the two raids violated the Fourth Amendment. No reasonable law enforcement officer in the circumstances presented here could have believed that probable cause existed to search the entire Club and seize all of its occupants.

Defendants place great weight on their contention that exigent circumstances justified the broad search and seizures that occurred during the raids on the Club. We have explained that "[t]he exigent circumstance doctrine provides that when probable cause has been established to believe that evidence will be removed or destroyed before a warrant can be obtained, a warrantless search and seizure can be justified." *United States v. Young,* 909 F.2d 442, 446 (11th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 90, 116 L.Ed.2d 62 (1991). We need not address defendants' exigent circumstances argument, because it is well-settled that under this doctrine, "warrantless searches and seizures ... [require that] both probable cause and exigent circumstances exist." *United States v. Burgos,* 720 F.2d at 1525. Having concluded that the defendants lacked even arguable probable cause for anything beyond a search and seizure of the two suspects who had actually engaged in narcotics transactions, we find it unnecessary to decide whether a reasonable officer could have believed that sufficient exigent circumstances existed to excuse the warrant requirement if there had been probable cause to justify the actions that occurred.

■■■■■■ Defendants argue there was no violation of plaintiffs' rights, because the two raids were administrative searches of the Club to which the Club owners had previously consented. Even in the context of administrative searches of business property, however, the Fourth Amendment limits warrantless searches: "[P]rior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property." *Donovan v. Dewey,* 452 U.S. 594, 598, 101 S.Ct. 2534, 2537–38, 69 L.Ed.2d 262 (1981). While "legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment," *id.* at 598, 101 S.Ct. at 2538, pretextual administrative searches do:

[T]he Fourth Amendment protects the interest of the owner of property in being free from *unreasonable* intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests. Similarly, warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials.

*Id.* at 599, 101 S.Ct. at 2538 (citations omitted) (emphasis in original). Thus, where an act authorizing administrative inspections "fails to tailor the scope and frequency of such administrative inspections to the particular" governmental concern, and "does not provide any standards to guide inspectors either in their selection of establishments to be searched or in the exercise of their authority to search," a search warrant will be required. *Id.* at 601, 101 S.Ct. at 2539 (citing *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (holding that absent consent a warrant was constitutionally required in order to conduct administrative inspections under § 8(a) of OSHA)).

The facts viewed favorably to plaintiffs simply will not support an administrative search theory. Administrative inspections conducted on the Club and its predecessor establishment both before and after the two raids at issue in this case were accomplished without the massive show of force and excessive intrusion witnessed in the December 1990 and March 1991 raids. Moreover, during the two raids the officers did not simply search for violations of the liquor laws by the establishment; instead, a number of people were searched for evidence of their violation of drug laws, searches to which they did not consent as part of any regulatory scheme. No reasonable officer in the defendants' position could have believed that these were lawful, warrantless administrative searches.

▆▆▆▆▆ Sheriff Morgan advances another argument on the question of whether a genuine issue of fact exists as to whether he "engaged in conduct violative of the rights established by ... clearly-established law."

*Rich,* 841 F.2d at 1564. Although Sheriff Morgan acknowledges that he authorized both of the raids on the Club, he nonetheless contends that he could not have violated plaintiffs' rights because he was not personally involved in conducting the raids. According to the Sheriff, "the focus must center on the actions taken by [him] and the information he possessed in taking those actions." This argument fails for at least two reasons. First, although § 1983 does require proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation, "[p]ersonal participation ... is only one of several ways to establish the requisite causal connection." *Zatler v. Wainwright,* 802 F.2d 397, 401 (11th Cir.1986); *see also Sims v. Adams,* 537 F.2d 829, 831 (5th Cir.1976). Interpreting the Supreme Court's decision in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), this Court has observed that "it is clear that the inquiry into causation must be a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." *Williams v. Bennett,* 689 F.2d 1370, 1381 (11th Cir.1982), *cert. denied,* 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Thus, personal participation is not the *sine qua non* for Sheriff Morgan to be found personally liable under § 1983. "[L]iability may be imposed due to the existence of an improper policy or from the absence of a policy." *Rivas v. Freeman,* 940 F.2d 1491, 1495 (11th Cir.1991) (summarizing preexisting law); *see also Zatler,* 802 F.2d at 402 ("[A]ny alleged failure to adopt adequate policies for inmate protection must amount to a breach of [defendant's] duty and must evidence reckless disregard or deliberate indifference to [plaintiff's] constitutional rights.").

Second, and equally compelling, there were *two* raids in this case during which allegedly unconstitutional conduct occurred. Sheriff Morgan bases his claim to qualified immunity on his lack of personal involvement in and his lack of knowledge as to the details regarding the conduct of both raids. Citing this Court's opinion in *Hardin v. Hayes,* 957 F.2d 845 (11th Cir.1992), Sheriff Morgan urges us

to focus on the information he possessed at the time he authorized the raids. We do so, but we cannot ignore the stark factual distinction between *Hardin* and the present case: In *Hardin* there was one suicide; in this case there were two raids. Indeed, at oral argument, Sheriff Morgan's counsel conceded that after the first raid, Sheriff Morgan was debriefed on how the raid had been conducted. Counsel further acknowledged that what happened at the second raid was materially identical to the events of the first raid. Thus, even if Sheriff Morgan had a reasonable basis for believing that his policies and training were adequate going into the first raid, that fails to explain why he authorized exactly the same conduct three months later in March of 1991, when he had reason to know better.

Similarly, even if Chief Morgan and Officer Dendinger had not been fully aware of the Task Force's plan of attack before the first raid, as participants in the first raid they had ample opportunity to determine before the second raid was conducted whether the first had comported with constitutional requirements. Upon learning of the manner in which the first raid was conducted, reasonable law enforcement officials would have been on notice that clearly established Fourth Amendment rights had been violated. Willingness to engage in the second raid demonstrated deliberate indifference to those rights, and it reflected accession to and adoption of the policies and procedures employed.

We hold that the law was clearly established in December of 1990 and March of 1991 that the Fourth Amendment proscribed the alleged conduct that law enforcement officials, including the individual defendants, engaged in in connection with the raids on the Club. Finding that the plaintiffs have, at a minimum, raised a genuine issue of material fact as to whether these defendants engaged in such conduct, we conclude that the district court properly denied the defendants' motions for summary judgment on qualified immunity grounds as to the Fourth Amendment claims.

b. The Equal Protection Clause Claims

■ The district court also held that " 'the equal protection right to be free from

intentional racial discrimination' was clearly established," and found "sufficient evidence [adduced by plaintiffs] to create a genuine issue of material fact as to whether the raids may have been racially motivated." The court specifically pointed to: the statement of Officer Dendinger to Mattie Staples regarding the intention to close the Club down because of the race of the owners and patrons; Sheriff Morgan's deposition testimony that the black-owned Club was the only one raided in his twenty-one years as sheriff; and evidence of a higher incidence of DUI offenses for blacks than whites in the vicinity of the Club. The court acknowledged that this evidence had "mixed implications," but held that it was sufficient to raise triable issues of fact.

Defendants do not challenge the district court's holding that at the time of the raids the right to be protected from intentional racial discrimination in law enforcement was clearly established. Instead, they argue that summary judgment should have been granted because there was no genuine issue of material fact that they engaged in such discrimination. Based on our review of the record, we agree with the district court that a genuine issue of material fact does exist about whether the defendants engaged in intentional racial discrimination in authorizing or participating in the raids. The district court properly denied the summary judgment motions as to the equal protection claims.

c. The Due Process Clause Claims

■ The district court denied the individual defendants' qualified immunity motions as to the due process claims. We conclude that it erred in doing so.

To the extent that the due process claims are concerned with the use of excessive force, *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) forecloses any contention that the law was clearly established in 1990 and 1991 that use of excessive force violated the Due Process Clause. In *Graham*, the Supreme Court held:

*all* claims that law enforcement officers have used excessive force—deadly or not—

in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

*Id.* at 395, 109 S.Ct. at 1871 (emphasis in original). This Court has recently joined the First, Sixth and Ninth Circuits in purporting to narrow the scope of *Graham,* by holding "that a non-seizure Fourteenth Amendment substantive due process claim of excessive force survives *Graham." Wilson v. Northcutt,* 987 F.2d 719, 722 (11th Cir.1993). However, our 1993 decision in *Wilson* came two years too late to establish the law at the time of the two raids in this case. At the time of these raids, the law was not clearly established that excessive force in connection with a search violated not only the Fourth Amendment but also the Due Process Clause.

The complaint suggests that plaintiffs also contend that due process liberty and property rights were violated by a deliberate attempt of the defendants to drive the Club out of business through pretextual law enforcement raids. Plaintiffs rely on a substantially analogous case in which the Ninth Circuit upheld a jury verdict on a § 1983 action based, in part, on an alleged due process violation. *Benigni v. City of Hemet,* 879 F.2d 473 (9th Cir.1988). In *Benigni,* the plaintiff owned a restaurant and bar and claimed that constant police harassment of his business and customers forced him to sell the business at a loss. The Ninth Circuit found that "[t]he due process clause protects a liberty or property interest in pursuing the 'common occupations or professions of life.'" *Id.* at 478 (quoting *Schware v. Board of Bar Examiners,* 353 U.S. 232, 238–39, 77 S.Ct. 752, 755–56, 1 L.Ed.2d 796 (1957) ("A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.")).

Under qualified immunity analysis, the question is whether it was *clearly established* at the time of the raids that the Due Process Clause proscribed attempts by law enforce-

ment to force citizens out of business through the use of repeated and improperly motivated raids of their business establishments. It may have been in the Ninth Circuit by virtue of the *Benigni* decision, but the courts of appeals generally and this Circuit in particular have not addressed the specific question involved. Plaintiffs' counsel conceded as much at oral argument when he stated that he had located no authority that clearly established on these facts a due process right that is separate and distinct from an equal protection right. Because such a due process right was not clearly established at the time of the raids in this case, Sheriff Morgan, Chief Morgan and Officer Dendinger are entitled to qualified immunity on the due process claims. Qualified immunity applies to monetary damages relief, but not to declaratory and injunctive relief. *Fortner v. Thomas,* 983 F.2d 1024, 1029 (11th Cir.1993). Therefore, the summary judgment motions of the three individual defendants should have been granted as to the due process claims to the extent plaintiffs seek monetary damages.

### 3. *Summary*

We hold that the individual defendants in this case have established the defense of qualified immunity as to plaintiffs' due process claims, but not as to the Fourth Amendment and equal protection claims. Accordingly, their summary judgment motions were properly denied, except as to the due process claims. Judgment should have been entered for the defendants on the monetary damages part of the due process claims.

### B. THE COUNTY COMMISSION'S APPEAL

#### 1. *The Jurisdiction Issue*

The denial of a motion for summary judgment generally is not a final judgment for purposes of appellate jurisdiction. However, an exception exists where the summary judgment motion is based on a claim of qualified immunity "to the extent that [the denial] turns on an issue of law...." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *see also McDaniel v. Woodard,* 886 F.2d 311, 313 (11th Cir.1989). That is why we reviewed

the order denying the summary judgment motions of the individual defendants; those motions were based on the qualified immunity doctrine. Of course, the mere fact that a district court's order includes a denial of qualified immunity does not mean that all issues addressed in that order are immediately appealable. To be appealable the parts of a summary judgment order addressing other issues must either independently meet the requirements of the *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949), test; or, we must be persuaded to exercise our discretionary pendent appellate jurisdiction over them. Because the County Commission's summary judgment motion was not based upon the qualified immunity doctrine, the exception that permits interlocutory appeals of qualified immunity issues is inapplicable. Instead, the County Commission argues the *Cohen* collateral order doctrine and, alternatively, seeks to invoke our discretionary pendent appellate jurisdiction power.

### a. The *Cohen* Test

 . To satisfy *Cohen,* an order must: (i) "conclusively determine the disputed question," (ii) "resolve an important issue completely separate from the merits of the action," and (iii) "be effectively unreviewable on appeal from a final judgment." *Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 431, 105 S.Ct. 2757, 2761, 86 L.Ed.2d 340 (1985). Applying this test to the present case, it is readily apparent that the *Cohen* standard is not met because, for one thing, the question of whether the County may be held liable for the Sheriff's law enforcement actions is reviewable on appeal from a final judgment. In reaching this conclusion, we reject the County Commission's attempt to recast the third component of the *Cohen* test as an inquiry into whether the Commission's " 'right' to forego litigation" has been denied. Such a formulation would effectively eviscerate the *Cohen* test, because many of the erroneous legal rulings of a district court

would constitute a denial of a party's "right" to forego litigation, thereby entitling that party to take an interlocutory appeal. The *Cohen* Court could not have intended such a result.

### b. Pendent Appellate Jurisdiction

 While the doctrine of pendent appellate jurisdiction has received mixed reviews in the courts of appeals, we have given it our blessing in several cases including *Schmelz v. Monroe County,* 954 F.2d 1540, 1542–43 (11th Cir.1992), and *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d at 1508–09.[3] In considering the question of pendent jurisdiction over an Eleventh Amendment immunity defense, the *Stewart* court found that "[p]endent jurisdiction is properly exercised over nonappealable decisions of the district court when the reviewing court already has jurisdiction over one issue in the case." *Stewart,* 908 F.2d at 1509 (citing 9 *Moore's Federal Practice* ¶ 110.25 ("[O]nce a case is lawfully before a court of appeals, it does not lack power to do what plainly ought to be done.")); *see also Schmelz,* 954 F.2d at 1543 (pendent appellate jurisdiction "is based on concerns for judicial economy"); *but see Natale v. Town of Ridgefield,* 927 F.2d 101, 104 (2d Cir.1991) ("Only in exceptional circumstances should litigants, over whom this Court cannot ordinarily exercise jurisdiction, be permitted to ride on the jurisdictional coattails of another party."). We have stated repeatedly that whether to exercise pendent appellate jurisdiction is discretionary. *See, e.g., Akin v. PAFEC Ltd.,* 991 F.2d 1550, 1563–64 (11th Cir.1993) (declining to exercise discretion under the pendent appellate jurisdiction doctrine to consider objections to the district court's ruling on plaintiff's untimely jury demand); *Crymes v. DeKalb County,* 923 F.2d 1482, 1485 & n. 4 (11th Cir.1991) (declining to "delineat[e] ... the scope of our discretion to exercise jurisdiction over issues pendent to an interlocutory appeal from a denial of absolute immunity"). For reasons

---

**3.** *See also Akin v. PAFEC Ltd.,* 991 F.2d 1550, 1563–64 (11th Cir.1993); *Andrews v. Employees' Retirement Plan,* 938 F.2d 1245, 1247–48 (11th Cir.1991); *Crymes v. DeKalb County,* 923 F.2d 1482, 1485 (11th Cir.1991); *Broughton v. Courtney,* 861 F.2d 639, 641 n.1 (11th Cir.1988); *West-*

*ern Electric Co. v. Milgo Electronic Corp.,* 568 F.2d 1203, 1208 (5th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978); *Myers v. Gilman Paper Corp.,* 544 F.2d 837, 847 (5th Cir.), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

of judicial economy, we choose to exercise our pendent jurisdiction in this instance as we did in the *Stewart* and *Schmelz* cases. If the County Commission is correct about the merits in its appeal, reviewing the district court's order would put an end to the entire case against the County, because there are no pendent state law claims against it.

### 2. *The Merits of the County Commission's Appeal*

 The County Commission correctly notes that § 1983 liability may not be grounded in a theory of *respondeat superior.* The Supreme Court so held in *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). A city or county government may be subjected to § 1983 liability, however, for the acts of an official who "possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). A county may be liable under § 1983 just as a city may be. *See, e.g., Parker v. Williams*, 862 F.2d 1471, 1477 (11th Cir.1989).

 This Court has found it "well established that a municipality may be held liable under § 1983 only when the deprivation at issue was undertaken pursuant to [municipal] 'custom' or 'policy.'" *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479 (11th Cir. 1991). The *Brown* Court further noted that the policy or custom need not have been put in place by the municipality's legislative body. Rather, "a municipal official who has 'final policymaking authority' in a certain area of the city's business may by his or her action subject the government to § 1983 liability when the challenged action falls within that authority." *Id.* at 1480 (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) and *Pembaur*, 475 U.S. at 481, 106 S.Ct. at 1299); *see also Mandel v. Doe*, 888 F.2d 783, 792–93 (11th Cir.1989). "Whether a particular official has final policymaking authority is a question of state law." *Brown*, 923 F.2d at 1480 (citing *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989)).

 The Alabama Supreme Court has held that "[a] sheriff is not an employee of a county for purposes of imposing liability on the county under a theory of respondeat superior." *Parker v. Amerson*, 519 So.2d 442, 442 (Ala.1987). As the Alabama Court observed, the decision of the Alabama Constitutional Convention of 1901 to make county sheriffs executive officers of the state was a response to "[t]he failure of county courts to punish sheriffs for neglect of duty and sheriffs' acquiescence in mob violence and ruthless vigilantism." *Id.* at 443. This Court, however, found in *Parker v. Williams*, 862 F.2d 1471 (11th Cir.1989), that the fact that an Alabama sheriff "works" for the state does not answer the question of whose policy he implements when he takes action. 862 F.2d at 1478. As *Parker* teaches, "[t]he pivotal point is whether [Sheriff Morgan] was exercising county power with final authority" when he authorized the law enforcement raids in this case. *Id.*

In *Parker*, liability was imposed on the county by virtue of the sheriff's hiring decisions relating to the county jail. This Court found that based on Alabama statutes, "Alabama counties and their sheriffs maintain their county jails in partnership". *Id.* at 1478–79. The Commission argues that there is no such law enforcement partnership between Alabama counties and their sheriffs. It points out that under Alabama law, it is:

the duty of sheriffs in their respective counties, by themselves or deputies, to ferret out crime, to apprehend and arrest criminals and, insofar as within their power, to secure evidence of crimes in their counties and to present a report of the evidence so secured to the district attorney or assistant district attorney for the county.

Ala. Code § 36–22–3(4) (1991). The Commission contends that no similar law enforcement duty or authority has been bestowed upon the County itself. We agree. Plaintiffs have not cited us to any statutes or decisions indicating that Alabama counties, and their governing commissions, have law enforcement authority or duties. Because Alabama counties are "authorized to do only those things permitted or directed by the legislature of Alabama," *Lockridge v. Etowah*

*County Comm'n,* 460 So.2d 1361, 1363 (Ala. Civ.App.1984), and because the State has not assigned the counties any law enforcement authority, the sheriff is not exercising county power when he authorizes a raid on suspected criminal activity within his county. At least three federal district court Judges sitting in Alabama that have addressed this issue have reached the same conclusion: *Forehand v. Roberts,* No. CV–92–A–601–N, slip op. at 2–3 (M.D.Ala. Aug. 11, 1992) (Albritton, J.); *Smith v. Arndt,* No. CV–92–H–1227–NE, slip op. at 2–3, 1992 WL 547727 (N.D.Ala. July 14, 1992) (Hancock, J.); and *Sanders v. Miller,* No. CV–91–N–2804–NE, slip op. at 4–7, 1992 WL 547699 (N.D.Ala. Apr. 13, 1992) (Nelson, J.). Each of those district courts found that unlike the jail function identified in *Parker v. Williams,* there is no law enforcement "partnership" between Alabama counties and their sheriffs. We hold that Sheriff Morgan is not the final repository of Chambers County's general law enforcement authority, because it has none. Therefore, the County Commission is not liable for the Sheriff's law enforcement actions under 42 U.S.C. § 1983, and it is entitled to summary judgment on the § 1983 claims.

 Our holding that Sheriff Morgan is not the final law enforcement decisionmaker for Chambers County also compels us to conclude that the Commission cannot be held liable under 42 U.S.C. § 1985(3), either. The elements of a cause of action under § 1985(3) are well established: a conspiracy for the purpose of denying any person or class of persons equal protection; an act in furtherance of the conspiracy; and an injury to a person, his property, or the deprivation of any right or privilege belonging to citizens of the United States. *Burrell v. Board of Trustees of Ga. Military College,* 970 F.2d 785, 793–94 (11th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1814, ·123 L.Ed.2d 445 (1993). We have previously observed that "[t]he language of Section 1985 which requires an intent to deprive · one of equal protection or equal privileges and immunities means that there must be some racial or otherwise class-based invidiously discriminatory animus behind the conspirators' action." *Byrd·v. Clark,* 783 F.2d 1002, 1007–08 (11th Cir.1986). As with § 1983, the theory of *respondeat superior* will not support liability

under § 1985(3). *Owens v. Haas,* 601 F.2d 1242, 1247 (2nd Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). Instead, a plaintiff must allege and prove each defendant's participation in the conspiracy, or a policy or custom of a municipal defendant that is causally related to the conspiracy. *See, e.g., Arnold v. Board of Educ. of Escambia County,* 880 F.2d 305, 318 (11th Cir.1989) (plaintiff failed to "allege any school board act from which the school board's participation in the conspiracy may be inferred").

Plaintiffs in the present case have shown no facts to establish the County Commission's involvement in a § 1985(3) conspiracy. There is no evidence in the record which links the Commission or any of its members to the alleged civil rights violations. Because the law enforcement actions and policies of Sheriff Morgan cannot be imputed to the County Commission, there exists no genuine issue of material fact about the Commission's involvement in a conspiracy to deprive the plaintiffs of their civil rights. It had no such involvement. We hold, therefore, that the Commission is also entitled to summary judgment on the § 1985(3) claims.

## C. THE CITY'S APPEAL

### 1. *The Federal Claims*

· The City seeks review of the denial of its summary judgment motion on the federal civil rights claims. The City's argument parallels the County Commission's: Chief Morgan was not the final decisionmaker for City law enforcement authority because the "City defendants had no authority" over the conduct of the two raids. The focus, however, is not on whether Chief Morgan exercised authority over the conduct of the raid, but rather on whether his participation in the raids, by virtue of his position and authority within the City, put the City's imprimatur on the unconstitutional conduct.

The district court did not expressly decide the issue of whether Chief Morgan exercised final policymaking authority in the law enforcement area for the City. The court noted only that the City could "be held liable on Counts I and ·II ... for Chief Morgan's

decision to participate in the allegedly illegal raids of the Capri Club under Section 1983 *if* Chief Morgan is the final policy-maker for the City in the area of law enforcement" (emphasis added). However, the court declined to grant the City summary judgment "without some assertion that the Plaintiffs cannot prove that Chief Morgan was the final policy-maker in this area."

 The City's appeal of the district court's action does not meet the requirements of the *Cohen* collateral order test, because the order does not conclusively determine the disputed question, and the issue is not unreviewable after final judgment. We also decline to exercise our discretionary pendent appellate jurisdiction, because of the state of the record on the issue. Relying on the Supreme Court's decisions in *Jett v. Dallas Indep. School Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), and *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), we have previously explained the process required to assess a claim of municipal liability based on a municipal official allegedly acting as a final policymaker:

> Under this theory of municipal liability, the first step of the inquiry is to identify those individuals whose decisions represent the official policy of the local governmental unit. As already discussed, this is a question of law to be resolved by the trial court judge. In making this determination, the court should examine not only the relevant positive law, including ordinances, rules and regulations, *but also the relevant customs and practices having the force of law.*

*Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir. 1989) (citations omitted) (emphasis added). In this case, there is no evidence in the record concerning "the relevant customs and practices having the force of law" which would define the distribution of law enforcement authority between the City and Chief Morgan. Indeed, the district court noted that the parties had not even briefed this issue before it. In light of this significant gap in the record, we will not exercise pen-

dent appellate jurisdiction over the City's appeal.

### 2. *The Pendent State Law Claims*

 In the aftermath of the district court's orders, the status of the state law claims is as follows:

1. Against Chambers County Commission: no surviving state law claims.
2. Against Sheriff Morgan: no surviving state law claims.
3. Against the City of Wadley: Count III (assault only) and Count IV (negligence) relating to the March, 1991 raid are the only surviving state law claims.
4. Against Chief Morgan: Count III (assault and false imprisonment) and Count IV (negligence) are surviving state law claims.
5. Against Officer Dendinger: Count III (assault and false imprisonment) is the only surviving state law claim.

The City, joined by Chief Morgan and Officer Dendinger, urge this Court to exercise pendent jurisdiction over the district court's denial of summary judgment on these state law claims. We decline to do so. Each of the three defendants against whom state claims survive must proceed to trial on the federal claims anyway. This trial will necessarily include presentation of evidence bearing directly on the state as well as the federal claims. Therefore, judicial economy concerns are not sufficiently implicated to justify use of pendent appellate jurisdiction. In reaching this conclusion, of course, we intimate no view as to the merits of these claims.

### III. CONCLUSION

As to the district court's order denying the qualified immunity summary judgment motions of Sheriff Morgan, Chief Morgan, and Officer Dendinger: we AFFIRM that denial insofar as the Fourth Amendment and equal protection claims are concerned; and, we REVERSE that denial insofar as the due process claims for monetary damages are concerned.

We REVERSE the district court's denial of the Chambers County Commission's motion for summary judgment. We hold that

because the actions and policies of Sheriff Morgan cannot be imputed to the County Commission, and because the plaintiffs have failed to offer evidence to establish the involvement of the Commission or any of its members in the alleged violations, the Commission is entitled to summary judgment on all the federal claims. Therefore, summary judgment in favor of the County Commission on Counts I and II of the complaint is due to be granted.

We decline to exercise jurisdiction over the City's appeal of the district court's denial of the City's motion for summary judgment. Our decision here is not meant to foreclose further development of the facts and consideration by the district court of whether Chief Morgan was the final law enforcement decisionmaker for the City at the time of the raids.

We also decline to exercise jurisdiction over the appeals of the City, Chief Morgan, and Officer Dendinger concerning the district court's denial of summary judgment to those defendants on the pendent state law claims.

Accordingly, we AFFIRM in part, REVERSE in part, and REMAND this case for further proceedings consistent with this opinion.