Opinion issued
May 19, 2011



In
The

Court of
Appeals

For
The

First District
of Texas

———————————

NO. 01-10-00602-CV

———————————

Texas Department of Public Safety, Appellant

V.

Hugo
Rodriguez and Maria Rodriguez, Appellee



 



 

On Appeal from the 215th District
Court

Harris County, Texas



Trial Court Case No. 2008-42092

 



 

 

O P
I N I O N

 

          This
interlocutory appeal arises from a personal injury lawsuit brought
by Hugo Rodriguez and Maria Rodriguez as a result of an automobile collision
with a vehicle driven by an officer of the Texas Department of Public
Safety.  The trial court denied
DPS’s plea to the jurisdiction, which was based on the defense of official
immunity for its officer, Sergeant Parker. 
      On appeal, DPS contends that
Sergeant Parker did not have to satisfy the heightened need/risk assessment elaborated
in Wadewitz v.
Montgomery, 951 S.W.2d
464, 467 (Tex. 1997), for determining whether a public official acts in good
faith for purposes of the official immunity defense for police pursuit cases.  Under Wadewitz,
the good faith determination utilizes a two-part
test that balances the seriousness of the situation, as well as the
alternatives available to the official, against the risks created by the
conduct.  Scott v. Britton, 16 S.W.3d 173, 179 (Tex. App.—Houston [1st Dist.]
2000, no pet.).  DPS argues that this
Court should instead utilize the more general good faith test described in Telthorster
v. Tennell, 92 S.W.3d 457, 462 (Tex. 2002).  DPS asserts that this general test, which
does not require a specific assessment of need/risk of the officer’s
decision-making, applies in a lawsuit arising from a vehicular accident
resulting from moving surveillance of potential criminal activity. 

          For reasons
explained below, we conclude that the need/risk analysis of Wadewitz applies.  We hold that DPS did not conclusively
establish Sergeant Parker’s good faith under that test.  We therefore affirm.

Factual Background

          DPS
Sergeant Parker was part of a
team of police officers conducting ongoing surveillance of a person suspected
of criminal drug activity.  The drug
investigation began after the suspect made several deposits of more than
$10,000 into a local financial institution, generating a suspicious activity report
from the IRS.  Both Sergeant Parker and his
supervising officer, Lieutenant Webb, stated the purpose of
the surveillance was “documenting the activities of a subject under
investigation.” 

          Sergeant
Parker was part of a 7 to 10 member team of officers participating in the moving
surveillance.  Lieutenant Webb was
traveling behind the suspect’s vehicle, and Sergeant Parker followed Lieutenant
Webb in an unmarked van.  Shortly before
noon, Sergeant Parker was traveling south in the middle lane of Kirby Drive
approaching Old Spanish Trail in Houston, Texas.  Both Kirby and Old
Spanish Trail are divided two-way streets with multiple lanes of traffic in
both directions. Each street had a speed limit of 40 miles per hour.  This is an intersection with a high volume of
traffic. 

          As
Sergeant Parker reached the intersection, he saw the suspect’s vehicle proceed
through a yellow light.  The light
changed to red before he reached the intersection.  Lieutenant Webb successfully ran the red
light but Parker stopped his vehicle.  After
checking approaching traffic in all lanes, he concluded that it was safe to drive through the intersection.  According to his deposition and affidavit, Sergeant Parker
cautiously moved into the intersection across Old Spanish Trail.  One vehicle, however,
was stopped in the middle lane of the eastbound traffic on Old Spanish Trail,
obstructing his view of traffic in the outside lane of Old Spanish Trail. 

          Hugo
Rodriguez was unfortunately traveling
eastbound in that outside lane and therefore was not seen by Parker as he
attempted to pass through the intersection.  Rodriguez collided with Sergeant Parker in the
intersection.   According to Sergeant
Parker’s affidavit, the collision occurred “at a very low speed.”  Hugo and his wife Maria were injured.  Both vehicles were driven from the
scene by their respective drivers. 

          The Fleet
Safety Board investigated the accident.  The
board determined that the collision was preventable, that Sergeant Parker’s
disregard of the red light was the major contributing factor to the collision,
and that Sergeant Parker failed to do everything reasonable to prevent the
collision.

Procedural Background

          The
Rodriguezes sued DPS, but did not sue Sergeant Parker individually.  The Rodriguezes claimed, among other acts of
negligence, that Sergeant Parker disregarded the traffic light, failed to
maneuver his vehicle so as to avoid the collision, and engaged in faulty
evasive action.  The Rodriguezes also
included a claim for gross negligence. 

          In a single
pleading, DPS filed a plea to the jurisdiction, motion for summary judgment and
motion to dismiss.  DPS asserted the
affirmative defenses of sovereign and official immunity.  The plea was supported by the affidavits of
Sergeant Parker and Lieutenant Webb. 
Neither of these affidavits provided details about why Parker, as a
member of the surveillance team, needed to continue through the intersection on
a red light.  Parker did not testify that
the suspect had been speeding or driving recklessly so that it would be
difficult or dangerous to catch up to Lieutenant Webb. 

          In response,
the Rodriguezes filed portions of the deposition of Sergeant Parker and the
letter from the Fleet Safety Board concluding that the accident was preventable.  They did not offer any affidavit from an
expert.

          The trial
court denied the plea to the jurisdiction, motion for summary judgment, and
motion to dismiss.  DPS timely
appealed.  We have jurisdiction over this
interlocutory appeal pursuant to sections 51.014(a)(5) and (8) of the Texas
Civil Practice and Remedies Code.  See Tex.
Civ. Prac. & Rem. Code Ann. § 51.014(a)(5), (8) (West 2008); City of Houston v. Kilburn, 849 S.W.2d
810, 812 (Tex. 1993).

Standard of Review

          We
review a trial court’s ruling on a plea to the jurisdiction de novo.  Tex.
Dept. of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 228 (Tex. 2004); Tex. Natural Res. Conservation Comm’n v.
IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002). When
reviewing a trial court’s ruling on a plea, “we first look to the pleadings to
determine if jurisdiction is proper, construing them liberally in favor of the
plaintiffs and looking to the pleader’s intent.”  City of
Waco v. Kirwan, 298 S.W.3d 618, 621–22 (Tex. 2009).   

          A
defendant’s plea may challenge either the plaintiffs’ pleadings or the
existence of jurisdictional facts.  See Miranda, 133 S.W.3d at 226­–27.  When, as here, the defendant
challenges the existence of jurisdictional facts, “we consider relevant
evidence submitted by the parties when necessary to resolve the jurisdictional
issues raised.”  Id. at 227; see also Tex. Natural Res.
Conservation Comm’n v. White,
46 S.W.3d 864, 868 (Tex. 2001).  If that evidence
raises a fact issue as to jurisdiction, the defendant’s plea must be denied.  Miranda, 133 S.W.3d at 227­–28.  If,
however, the relevant evidence is undisputed or does not present a
jurisdictional fact issue, the plea should be granted.  Id. at 228.  

          The standard
of review for a plea to the jurisdiction “generally mirrors that of a summary judgment
under Texas Rule of Civil Procedure 166a(c).”  Id.  Therefore, the governmental unit asserting an
official immunity affirmative defense must meet the summary judgment standard
of proof as a movant.  Ross v. Linebarger, Goggan, Blair &
Sampson, L.L.P., 333 S.W.3d 736, 744 (Tex.
App.—Houston [1st Dist.] 2010, no pet.). 
Once it meets its burden of proof, the plaintiff must show that a
disputed material fact exists.  Id. 
In considering the evidence, we “take as true all evidence favorable to
the nonmovant” and “indulge every reasonable inference and resolve any doubts
in the nonmovant’s favor.”  Miranda, 133 S.W.3d at 228.  “In deciding a plea to the jurisdiction, a court may not
consider the merits of the case, but only the plaintiff's pleadings and the
evidence pertinent to the jurisdictional inquiry.”  Ross, 333 S.W.3d at 744 (citing Cnty.
of Cameron v. Brown, 80
S.W.3d 549, 555 (Tex. 2002)).

Claims against DPS

          Under the
doctrine of sovereign immunity, DPS is not liable for the torts of its officers
unless there is a waiver of immunity.  Mount
Pleasant Indep. Sch. Dist. v. Estate of Lindburg, 766 S.W.2d 208, 211 (Tex. 1989).  Section 101.021 of the Texas Tort Claims Act
grants a limited waiver of sovereign immunity for personal injuries proximately
caused by “the negligence of an employee acting within the scope of his employment”
if the injuries “arise[] from the operation or use of a motor-driven vehicle.”  Tex.
Civ. Prac. & Rem. Code Ann. § 101.021(1)(A) (West 2011).

          Waiver of
immunity under this section of the Texas Tort Claims Act also
requires proof that “the employee would be personally liable to the claimant
according to Texas law . . . .”  Tex. Civ. Prac. & Rem. Code Ann.
§ 101.021(1)(B) (West 2011).  Conversely,
if the employee is protected from liability because of official immunity, then
the governmental entity is shielded from liability due to its sovereign
immunity.  Univ. of Houston v. Clark, 38 S.W.3d 578, 580 (Tex. 2000); Dewitt v. Harris Cnty., 904 S.W.2d 650,
653 (Tex. 1995); Kilburn, 849 S.W.2d
at 812.  In other words, if Sergeant
Parker is immune from tort liability under the official immunity doctrine, DPS is also immune.  See Tex.
Civ. Prac. & Rem. Code Ann. § 101.021(1)(B); see Clark, 38 S.W.3d at 580.

Official Immunity

          Government
officials are entitled to official immunity[1]
for (1) the performance of their discretionary duties (2) conducted within the
scope of their authority (3) provided they act in good faith.  Telthorster,
923 S.W.3d at 461; City  of Lancaster v. Chambers, 883 S.W.2d 650,
653 (Tex. 1994).  The Rodriguezes do not
contest that Sergeant Parker acted within the scope of his authority or that
his actions were discretionary.  Thus, it
is the third element, good faith, that is in dispute here.  Only when the defendant conclusively
establishes each of the three elements of qualified immunity does a plaintiff
have to rebut the qualified immunity with proof of bad faith.  See
Telthorster, 92 S.W.3d at 461; Kassen
v. Hatley, 887 S.W.2d 4, 8–9 (Tex. 1994). 
If the government official does not prove each element of official
immunity, the burden never shifts to the plaintiff to come forward with
controverting evidence.  City of
Pasadena v. Belle, 297 S.W.3d 525, 531 (Tex.
App.—Houston [14th Dist.] 2009, no pet.); see
also Telthorster, 92 S.W.3d at
465.

          We must first
determine the proper test for evaluating whether Sergeant Parker acted in good
faith.  The Rodriguezes assert that the
heightened need/risk analysis of Wadewitz should apply.  DPS asserts that this Court should utilize
the more general good faith test described in Telthorster. 
As discussed below, we must address this issue because if Wadewitz applies, DPS has a higher burden
of proof to establish Sergeant Parker’s good faith.

A.      Introduction

          Because it is
difficult to determine the contours of the good faith inquiry that is part of
the official immunity defense, we begin with a discussion of the policies
behind official immunity and its historical development.  See Chambers,
883 S.W.2d at 656.  Official immunity is
an affirmative defense that an official must plead and prove.  Clark,
38 S.W.3d at 580; Wadewitz, 951
S.W.2d at 465.  The official immunity
doctrine protects public officers from civil liability for conduct that would
otherwise be actionable.  Chambers, 883 S.W.2d. at 654.  The Texas Supreme Court has noted that the
official immunity
doctrine requires “a fair balance between the competing interests at stake.”  Chambers,
883 S.W.2d at 656; see also Telthorster, 92 S.W.3d at 461; Clark, 88 S.W.3d at 580–81.  The court in Chambers
identified the competing interests as “(1) there is the injustice, particularly in the absence
of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; and (2) the danger that the
threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment
required by the public good.”  Chambers, 883 S.W.2d at 656.  The
purpose of official immunity was further explained by the Texas Supreme Court
in Kassen v. Hatley:

The purpose of official immunity is to insulate the
functioning of government from the harassment of litigation, not to protect
erring officials.  The public would
suffer if government officers, who must exercise judgment and discretion in
their jobs, were subject to civil lawsuits that second-guessed their decisions.
 Official immunity increases the
efficiency of employees because they need not spend time defending frivolous charges.

 

887 S.W.2d at 8 (citations
omitted); see also Ballantyne v. Champion Builders, Inc., 144 S.W.3d
417, 424 (Tex. 2004) (stating that official immunity’s purpose is to ensure
public officials “act in the public interest with confidence and without the
hesitation that could arise from having their judgment continually questioned
by extended litigation”); Travis
v. City of Mesquite,
830 S.W.2d 94, 102 n.4 (Tex. 1992) (observing that official immunity serves the following important public
policies: avoiding inhibition of discretionary action, minimizing deterrence of
qualified people from government service, avoiding costs of unnecessary trial, and insulating officials
from burdensome discovery).

B.      Good faith: an objective test

          Good
faith for official immunity is not measured by the official’s subjective
intent.[2]  Chambers,
following the lead of federal courts, rejected a subjective standard because it
would make summary judgments difficult to obtain and would largely eviscerate
the important public policy reasons for qualified immunity.  The court instead adopted a test of “objective
legal reasonableness.”  Chambers, 883 S.W.2d at 656 (quoting Swint v. City of Wadley, 5 F.3d 1435,
1441–42 (11th Cir. 1993)).  By adopting
an objective test, the court defined good faith “in a counter-intuitive
fashion” but also made it easier for a public official to obtain summary
judgment.  See Belle, 297 S.W.3d at 530. 

          The Court preferred an objective
standard because it “gives ample room for mistaken
judgments” by protecting “all but the plainly incompetent or those who
knowingly violate the law.”  Chambers, 883 S.W.2d at 656 (quoting Swint, 5 F.3d at 1441–42).  This accommodation for reasonable error
exists because “officials should not err always on the side of caution” out of
a fear of being sued.  Hunter v. Bryant, 502 U.S. 224, 229, 112
S. Ct. 534, 537 (1991) (citations omitted).   Official
immunity protects public officials from personal liability for “mistaken
judgment.”  Ballantyne, 144 S.W.3d
at 423.  Official immunity is based on
the recognition “that the risk of some error is preferable to intimidation from
action at all.”  Id. at 424.

          The objective
good faith element of the official immunity defense requires the defendant
official to prove that a reasonable official under the same or similar
circumstances could have believed the defendant’s conduct was justified. 
Chambers, 883 S.W.2d at 656–57. 
The test is “analogous to the abuse of discretion standard of review.”  Clark,
38 S.W.3d at 581.  Applying that general
test to a high-speed pursuit, the court stated that in such a case, the officer
acts in good faith if “a reasonably prudent officer, under the same or similar
circumstances, could have believed that the need to immediately apprehend the
suspect outweighed a clear risk of harm to the public in continuing the
pursuit.”  Chambers, 883 S.W.2d at 656. 
The test does not require the officer to
prove what a reasonably prudent officer should or should not have done.  Id.;
Belle, 297 S.W.3d at 531.[3]  Chambers,
therefore, gives public officials the
“benefit of the doubt” in close cases because if officers of reasonable
competence could disagree, immunity applies. 
883 S.W.2d at 656–57; Chapa v.
Aguilar, 962 S.W.2d 111, 114 (Tex. App.—Houston [1st Dist.] 1997, no writ).  

          In response
to evidence of objective good faith, the nonmovant must meet “an elevated
standard of proof” to defeat the official immunity defense.  Chambers,
883 S.W.2d at 656.  It is insufficient
for the nonmovant to show merely that other alternative courses of action would
have also been reasonable or preferable. 
Ballantyne, 144 S.W.3d at 426 (stating that the test “is not
what was the best course of action”).  It
is likewise insufficient for the nonmovant to show merely that the individual
defendant “did not act as a reasonably prudent official,” because proof of
negligence does not satisfy the objective good faith required by Chambers.  Beatty
v. Charles, 936 S.W.2d 28, 31 n.2 (Tex. App.—San Antonio 1996, no writ).[4]
 Instead, the nonmovant must show that “no
reasonable official could have thought that
the facts were such that they justified the official’s conduct.”  Chambers,
883 S.W.2d  at 657; Kassen,
887 S.W. 2d at 9.  Stated differently,
the nonmovant must show that a public official in the same position “could not
have reasonably reached the decision in question.”  Chambers,
883 S.W.2d at 657 n.7.

          Additionally,
the official’s actions are reviewed based on the facts known at the time rather
than subsequent evidence.  In other words,
the focus is on whether a reasonable official in light of the information
possessed by the defendants at the time they acted could have believed the
actions were justified.  Ballantyne, 144 S.W.3d at 426; Wadewitz, 951 S.W.2d at 467; Chambers, 883 S.W.2d at 656; Rhodes v. Torres, 901 S.W.2d 794, 800
(Tex. App.—Houston [14th Dist.] 1995, no writ).

C.      The specificity required for balancing
need vs. risk in an emergency pursuit

 

          In
Wadewitz, the Court adhered to Chambers’ general good-faith framework
but also “elaborated on the need and risk elements and applied them” to an
emergency response by a police officer traveling to the scene of a reported
burglary.  Telthorster, 92 S.W.3d at 461 (discussing Wadewitz). 

          Wadewitz explained that the need aspect
of the balancing test refers to the urgency of the circumstances requiring
police intervention and requires an evaluation of the following factors: (1)
the seriousness of the crime or accident to which the officer is responding,
(2) whether the officer’s immediate presence is necessary to prevent injury or
loss of life or to apprehend a suspect, and (3) what alternative courses of
action, if any, are available to achieve a comparable result. Id.  The risk aspect
refers to the countervailing public safety concerns and requires an evaluation
of the following factors: (1) the nature and severity of the harm the officer’s
actions could cause, (2) the likelihood that any harm would occur, and (3)
whether the risk of harm would be clear to a reasonably prudent officer.  Wadewitz,
951 S.W.2d at 467.[5]  In addition, the
facts of the case may require the expert to provide a continuing assessment of
the “need” and “risk” factors because emergency responses and police pursuits
may involve rapidly changing circumstances. 
Id. 

D.      Official immunity in an arrest

          DPS contends
that a need/risk balancing test does not need to be satisfied in lawsuits
against police officers that do not arise from a high-speed pursuit but from moving surveillance. 
Rather, DPS argues that we should follow Telthorster, in which the Texas
Supreme Court held that such an analysis was unnecessary in a claim arising out
of an arrest.  92 S.W.3d at 462. 
As an initial matter, DPS points out that the Court in Telthorster
emphasized that the Chambers “could
have believed” test balanced the need to apprehend a suspect against the risk
of harm applied “in a pursuit case,” and
therefore has no application to this case. 
See Telthorster, 92 S.W.3d at
461 (emphasis in original).

          The Court
in Telthorster, however, did not base
its decision on the label used to describe the police conduct in the case;
rather, it analyzed the rationale underlying the balancing test including whether
the requirement of a detailed need/risk analysis would effectuate the policy
concerns implicated in an arrest.  Id. at 462.  The Court noted a particular need to provide
immunity to protect police officers.  Id. at 463.

“Nowhere else in public service is official immunity more
appropriate or necessary than in police work.  In their routine work, police officers must be
free to make split-second judgments . . . based on their experience and
training, without fear of personal liability.”  If police officers were subject to liability
for every mistake, the constant threat of suit could “dampen the ardor of all
but the most resolute, or the most irresponsible” officers.

 

 Id. (citations omitted).[6]  The official immunity
doctrine is shaped in part by the public policy concern of avoiding
“overdeterrence of energetic law enforcement.” 
Id. (quoting Rowland v. Perry, 41 F.3d 177, 172 (4th
Cir. 1994)). 

          With
respect to high-speed driving, other specific policy concerns are implicated.  The first reason for adopting a risk/need
analysis in high speed pursuits is to improve protection of bystanders or other
innocent persons who might be injured. 
Second, requiring an officer “to particularly and meaningfully balance”
the need for and risk created by high speed pursuits ensures that the officer’s
consideration was more than “merely pro forma.” 
Id. at 464.  

Finally, the Court
compared the policy concerns impacted by a high-speed pursuit with those in an
arrest.  The “inherent risk to the
general public” created during an arrest are “not as substantial” as police
action causing injuries during a high-speed chase.  Id.  During arrest situations,
officers routinely are forced to make
split-second judgments in circumstances that are “tense, uncertain, and rapidly
evolving.”  Id. at 463.  The risk of liability might cause arresting
officers to act hesitantly when immediate action is required, subjecting
themselves and the public to unnecessary risks. 
Id. at 464.  Thus, when
an officer is engaged in an arrest that results in injury to the suspect, a particularized
need/risk assessment is not necessary.  Id.   

          Instead,
the arresting officer must satisfy the
general requirements of Chambers
without the specific need/risk analysis. 
The officer must demonstrate “that a reasonably prudent officer, under
the same or similar circumstances, could have believed that his conduct was
justified based on the information he possessed when the conduct occurred.”  Id.
at 465.  

          If
the arresting officer satisfies this burden, the nonmovant must likewise follow
the general standards set forth in Chambers.  The nonmovant in its response must offer
evidence that no reasonable officer
in the same or a similar situation “could have believed that the facts were
such that they justified his conduct.”  Id. at 460.  “‘[I]f officers of reasonable competence could disagree
on this issue,’ the officer acted in good faith as a matter of law.”  Id.
at 465 (quoting Malley v. Briggs, 475
U.S. 335, 341, 106 s. Ct. 1092, 1096 (1986)).[7]  

Conclusion on the Standard for Good Faith

          We conclude,
after examining the policies underlying immunity generally and the specific
policy concerns implicated in claims arising from pursuit cases that involve
violation of traffic laws, that Wadewitz’s
requirement for a specific need/risk assessment applies in this case.  

First, the general policies
underlying immunity are not undercut by applying Wadewitz here.  The focus of
official immunity “must remain upon the facts of the individual case and the
underlying policies promoted by official immunity.”  Kassen,
887 S.W.2d at 12.  The Wadewitz standard does not impose a
heavy burden on an officer and maintains the balance of the interests
implicated by the good faith standard for official immunity.  Requiring an officer to satisfy the need/risk
analysis when the officer violates traffic laws while pursuing a suspect during
moving surveillance does not overly deter “energetic law enforcement,”  Telthorster,
92 S.W.3d at 463 (quoting Rowland, 41
F.3d at 172), or make officers overly cautious in deciding whether to disregard
a red light.  In determining whether no
reasonable officer could have believed it was safe to violate a particular
traffic law under particular circumstances present at the time in question
based on the knowledge possessed at that time, the officer necessarily must
consider both the need to violate that law and the benefits of taking that
action.  The Wadewitz standard will still protect officers from lawsuits arising
from moving surveillance by giving them the benefit of the doubt in close
cases, excusing officer’s conduct that is not “legally correct” but is
“colorable,” and providing immunity for mere negligence.  See
Ballantyne, 144 S.W.3d at 426; Chambers, 883 S.W.2d at 657.  Under that standard, when a public official
considers two courses of action that could reasonably be believed to be
justified, and selects one, he satisfies the good faith “prong of official
immunity as a matter of law.”  Ballantyne, 144 S.W.3d at 426.  And the limitation that the
could-have-believed test focuses on the officer’s knowledge at the time in
question underscores the policy objective that the officer’s decision should
not be “second-guessed.”  Kassen, 887 S.W.2d at 8.  

Second, utilizing the Wadewitz standard also aids courts by
ensuring that officers attempting to establish official immunity do not submit
conclusory affidavits to satisfy their burden of proof but instead address the
specific needs and risks implicated by a traffic law violation.  Wadewitz,
951 S.W.2d at 466; Medina Cnty. Comm’rs
Court v. Integrity Grp., Inc., 944 S.W.2d 6, 10 (Tex. App.—San Antonio
1996, no writ); cf. Chapa, 962 S.W.2d
at 115 (recognizing that trial courts “struggle routinely with the adequacy of
affidavits in governmental immunity cases”). 
The officer must address the particular circumstances present in order
to avoid submitting conclusory proof.  Wadewitz, 951 S.W.2d at 466.  Wadewitz simply identifies the factors that an officer “particularly
and meaningfully balance” in assessing the need for police intervention in a
given case, factors that are inherent in the Chambers balancing test.  See Telthorster, 92 S.W.3d at 464; Clark, 38 S.W.3d at 582.  In the end, the requirement that the officer
address the need and benefit of his course of action when he violates a traffic
law during moving surveillance requires merely the elaboration of the facts
underlying what an officer could have believed was justified under the
circumstances. Given the public safety concerns discussed below, it is not too
much to ask officers to provide such proof. 

Third, the public safety concerns
implicated in accidents arising from police pursuit and emergency responses are
applicable to accidents arising from moving surveillance.  Official immunity balances the benefit to
society of protecting police officers against the need to provide compensation
for government imposed injuries.  The
risk to the general public is the same here, in Chambers, in Wadewitz,
and in Clark.  See
Clark, 38 S.W.3d at 583 (pursuing a suspect and responding to an emergency
involve the same general risk to the public—“a collision with a third
party”).  As in Chambers and Clark, this
case involves an officer’s violation of traffic laws while operating a vehicle
in “pursuit” of a suspect.  

          The safety
concerns implicated in an arrest are far different than those in moving
surveillance.  The Court, in deciding
that the Wadewitz need/risk analysis
did not apply to the arrest in Telthorster,
contrasted the significant differences in the risks inherent in the two
activities.  In Chambers, the risk was “[t]he inherent risk to the general public
that high-speed driving causes.”  Telthorster, 92 S.W3d at 464.  In Telthorster,
there was no “evidence that the circumstances surrounding [the suspect’s]
arrest created a risk to bystanders or the public in general.”  Id.  In this case, the decision to violate traffic
laws by running a red light, like the decision to violate a speed limit or
other traffic laws during a pursuit or emergency response, puts bystanders and
the general public at risk.   

          Finally, the
general policies underlying immunity and unflinching law enforcement are
particularly applicable in arrests.  In
an arrest situation, 

[a]rresting officers often confront at close range
suspects whose violent intentions and capabilities may not be readily
apparent.  A high risk of liability in
such a situation would likely compel arresting officers to act hesitantly when
immediate action is required, subjecting themselves and the public to
unnecessary “risks, and seriously hamper[ing] their efforts to apprehend
dangerous criminal suspects.”

 

Id. (quoting United States v. Merritt, 695 F.2d 1263,
1274 (10th Cir. 1982)).  The Court in Telthorster also noted that official immunity’s
underlying purpose, “in the context of street-level police work” protects
officers in situations that “frequently require[] quick and decisive action in
the face of volatile and changing circumstances.”  Id.  In contrast, in this case, the officers were
following—not confronting—a suspect. 
There is no evidence in this case that the situation was “volatile” or
involved the immediate potential danger of violence present in the arrest in Telthorster.      

          Because the
policy concerns in this case are more similar to Wadewitz than to Telthorster,
we conclude that the need/risk assessment of the good faith inquiry in Wadewitz and Clark should apply.  Thus, to
establish good faith, DPS must conclusively prove that a reasonably prudent
officer in the same or similar circumstances could have believed the need to
run the red light to continue the surveillance outweighed the risk of harm to
the public, taking into consideration all the Wadewitz factors.  Clark, 38 S.W.3d at 583.  That proof should address each of the need
and risk factors identified in Wadewitz.  See
951 S.W.2d at 464.

Application of that Standard to the Facts in this Case

          We must now
decide whether DPS’s evidence established that a reasonable police officer under
the same or similar circumstances as Sergeant Parker could have believed the decision
to proceed through the red light was justified. 
DPS offered two affidavits to satisfy its burden of proof on what a
reasonable officer could have believed. 
Although it is unnecessary to “use the exact language Wadewitz employs,” the movant’s summary
judgment evidence must “establish facts upon which the court could have based
its legal conclusion.”  Clark, 38 S.W.3d at 585–86; see also Telthorster, 92 S.W.3d at 465 (“[g]ood
faith is not mechanical inquiry, but rather turns on the particular facts
presented”). 

A.      Sergeant Parker’s affidavit 

          Sergeant
Parker’s affidavit states in pertinent part: 

I exercised my discretion and determined that the need to
protect the physical safety of the other investigating officers; the need to
maintain contact with the known suspect and the need to protect the public at
large from a suspected criminal activity, outweighed the minimal risk to the
public that would be created by continuing with the investigation and possibly
being involved in an accident while traveling to the suspected crime in
progress, therefore, I proceeded to follow the subject of our criminal
investigation.  Based upon all of my experience
and training in law enforcement, I can state that I acted in “good faith” as a
reasonable and prudent peace officer in making my decision to continue my
investigation.  Further, based upon all
of my experience and training in law enforcement, I can, and do, state that
another reasonably prudent peace officer, under the same or similar
circumstances, could have believed that the need to continue the moving
surveillance of the suspect, outweighed the minimal risk of harm to the public,
of a potential traffic accident, that would be created by the peace officer
traveling to the location of the reported crime in progress.  Based upon my experience and training as a
peace officer, I can, and do, state that I acted in “good faith” as a
reasonably prudent peace officer in the manner in which I drove my vehicle on
Kirby Drive in Houston, Texas.  Further,
based upon my training and experience as a peace officer, I can, and do, state
that another reasonably prudent peace officer, under the same or similar circumstances,
could have operated his vehicle in the same manner as I did; and, could have
determined that the need to continue the ongoing surveillance created a minimal
risk of harm to others at the intersection of Kirby Drive and Old Spanish
Trail.

   

B.      Lieutenant Webb’s affidavit

          In his affidavit, Lieutenant Webb states
in pertinent part: 

I believe that Sergeant Parker acted as a reasonably
prudent Sergeant under circumstances he observed at the time.  Sergeant Parker was fully justified in
concluding to continue his surveillance of the target’s vehicle and justified
in slowly and cautiously entering the intersection of Kirby Drive and Old
Spanish Tr[ai]l to do so.  Furthermore,
in my judgment and experience, I believe that a reasonably prudent peace
officer could have considered that surveillance and maintaining visual contact
with the suspect necessary to protect other officers, the public at large and
to continue his efforts at gathering relevant information for future
apprehension.  I believe Sergeant Parker
acted as a reasonably prudent officer would have acted given those
circumstances.



Lieutenant
Webb also states there were a “limited number of DPS vehicles able to maintain
visual contact with the surveillance target.”

C.      Conclusion 

          The
affidavits, to the extent that they contain assertions that Sergeant Parker had
a “need” to run the red light to continue surveillance, do not explain the need
in terms similar to the needs identified in Wadewitz.  The need factors
include: (1) the seriousness of the crime or accident to which the officer is
responding, (2) whether the officer’s immediate presence is necessary to
prevent injury or loss of life or to apprehend a suspect, and (3) what
alternative courses of action, if any, are available to achieve a comparable
result.  The “seriousness of the
crime or accident to which the officer responds” was not discussed; in fact,
there was only a suspected crime and no evidence of an emergency or an intent
to arrest or detain the suspect.  Both
Parker’s and Webb’s affidavits confirm that they were following the suspect for
the purpose of “documenting the [suspect’s] activities.”  Although both officers assert that Sergeant
Parker’s presence was necessary and allude to danger to other officers or the
public, no facts are detailed to support that conclusion that Parker’s
“immediate presence [was] necessary to prevent injury or loss of life or to
apprehend a suspect.”  See Wadewitz, 951 S.W.2d at 467
(conclusory affidavit is not sufficient to support summary judgment).  Neither officer suggests that the suspect was
armed or had a violent history or that the suspect was driving recklessly.  Neither officer addresses whether other
alternatives were available to Parker to remain part of the surveillance team,
such as staying in contact with Lieutenant Webb by radio to determine the
suspect’s location and catching up on other streets.  See Belle,
297 S.W.3d at 533 (citing Clark, 38
S.W.3d at 583) (noting affidavit that failed to address alternative course of
action as required by Wadewitz is
insufficient).  

While Sergeant Parker averred in
his affidavit that there were “a limited number of vehicles able to maintain
visible contact with the surveillance target vehicle,” he testified in his
deposition that “7 to 10” vehicles were involved in the surveillance.  Sergeant Parker did not offer evidence about
the number of DPS vehicles that passed safely through the intersection ahead of
him or the location of the other vehicles.[8]  His affidavit suggests that there was no plan
to confront or arrest the suspect. 
Sergeant Parker did not suggest that the suspect knew of the
surveillance or might try to take evasive action if Parker was delayed at the
red light.  He also did not address the
need to maintain continuous surveillance on that particular date or explain the
consequences of losing visual surveillance if Lieutenant Webb were also to lose
contact with the suspect.

Neither officer specifically
addresses the risk factors identified in Wadewitz.
 The risk
factors include: (1) the nature and severity of the harm the officer’s actions
could cause, (2) the likelihood that any harm would occur, and (3) whether the
risk of harm would be clear to a reasonably prudent officer.  Wadewitz, 951 S.W.2d at 466.  Sergeant
Parker describes the risk as “minimal” but does not explain the basis for this
conclusion except that he stopped and looked. 
There is no evidence from the two affidavits regarding the amount of the
traffic, the weather, road conditions, or visual obstructions.[9]

          Finally, the
required standard of review requires us to view the evidence in favor of the
Rodriguezes and draw all reasonable inferences in their favor.  There is no statement by Sergeant Parker or
Lieutenant Webb, or any other evidence, to establish that the “physical safety”
of the other officers was at risk.  There
is no evidence that Sergeant Parker, one vehicle out of a team of “7 to 10”
officers, was necessary to maintain contact with the suspect that they were
investigating or the location of the other officers.  Indeed, the evidence establishes that
Lieutenant Webb made it through the red light, and a reasonable inference from
that evidence is that he was able to maintain contact with the suspect.  There is no evidence that there was a
“reported crime in progress.”  Nor is
there any evidence that the surveillance could not be conducted without
Sergeant Parker.  The evidence before us
shows that Lieutenant Webb made it through the red light but, after the
accident with the Rodriguezes, returned to the scene.  A reasonable inference in favor of the Rodriguezes is that
other officers were available to continue the surveillance or that the need to
continue the surveillance was not so great that Lieutenant Webb could not stop
it to return to the scene of what DPS describes as a “low speed” accident.  These facts and the reasonable
inferences from these facts do not conclusively establish that a reasonable police
officer under the same or similar circumstances as Sergeant Parker could have
believed the decision to proceed through the red light was justified. 

          Because the
affidavits do not address all the Wadewitz
factors and do not state the facts upon which the conclusions are based, we
hold that the DPS did not establish Sergeant Parker’s objective good faith[10]
as a matter of law under the Wadewitz
standard.

          We overrule
the DPS’s sole issue.

Conclusion

          We affirm the trial court’s order
denying DPS’s plea to the jurisdiction, motion for summary judgment and
motion to dismiss.

 

 

 

 

                                                                   Harvey
Brown

                                                                   Justice


 

Panel consists of Justices Jennings, Higley,
and Brown.











[1]
       Official immunity is also
sometimes referred to as qualified immunity.  City of
Houston v. Daniels, 66 S.W.3d 420, 424 (Tex. App.—Houston [14th Dist.]
2001, no pet.); City of Hempstead v. Kmiec,
902 S.W.2d 118, 120 n.1 (Tex. App.—Houston [1st Dist.] 1995, no writ); see Travis
v. City of Mesquite, 830 S.W.2d 94, 100 n.2 (Tex. 1994) (Cornyn, J.,
concurring); see also Brand v. Savage, 920 S.W.2d 672, 674
(Tex. App.—Houston [1st Dist.] 1995, no writ). 
As we noted in Kmiec, “the
term ‘official immunity’ is confusing because official immunity covers acts
performed by a government official in the person’s individual capacity, not in
the person’s official capacity.”  902
S.W.2d at 120 n.1.  The phrase “qualified
immunity” underscores that the immunity is not absolute.





[2]           Indeed,
if a defendant only produces evidence of his or her subjective good faith,
summary judgment is inappropriate.  See Tex. Dep’t of Public Safety v. Tanner,
928 S.W.2d 731, 736 (Tex. App.—San Antonio 1996, no writ).  The subjective feelings of the public
official, whether they demonstrate subjective good faith or bad faith, are not
relevant to qualified immunity.  Ballantyne, 144 S.W.3d at 427–28; Thomas v. Collins, 960 S.W.2d 106, 111
(Tex. App.—Houston [1st Dist.] 1997, pet. denied); Rhodes, 901 S.W.2d at 798;
Tanner, 928 S.W.2d at 736. 





[3]           See also Clark, 38 S.W.3d at 581 (nonmovant’s response is insufficient if it
demonstrates merely that a reasonable officer could have decided not to take
the same action); Chapa v. Aguilar,
962 S.W.2d 111, 114 (Tex. App.—Houston [1st Dist.] 1997, no writ) (proof of the
actions that an official could have taken
rather than what a reasonable officer could
have believed is insufficient).





[4]           Although it has some concepts that overlap with
negligence principles (the objective good faith of the official is
reviewed under a standard that includes two elements similar to a general
negligence test—the “reasonable person” and “the same or similar circumstances”),
the good-faith standard is not the equivalent of a general
negligence test, which addresses what a reasonable person would have done.  Wadewitz, 951 S.W.2d
at 467.  “The standard of good faith as
an element of official immunity is not a test of carelessness or negligence, or
a measure of an official’s motivation.”  Joe
v. Two Thirty Nine Joint Venture, 145 S.W.3d 150, 164 (Tex. 2004).  To allow official immunity to be overcome by proof
of mere negligence would defeat the purposes of official immunity for
public officials who exercise broad discretion in their tasks.  See Belle, 297 S.W.3d at 531; see also Chambers, 883 S.W.2d at 655
(“The complex policy judgment reflected by the doctrine of official immunity,
if it is to mean anything, protects officers from suit even if they acted
negligently.”).





[5]           After Wadewitz and before Telthorster,
the Supreme Court rejected a governmental entity’s argument that the Wadewitz factors only apply to an
emergency response and do not apply to a police pursuit case.  Clark,
38 S.W.3d at 582.  The court held that
the general considerations leading to the adoption of the need/risk analysis
set forth in Wadewitz applied equally
to a police pursuit case.





[6]        One reason that police officers have broad discretion
is that they often make decisions “in an atmosphere of confusion, ambiguity and
swiftly moving events.”   Scheuer v. Rhodes, 416 U.S. 232, 242, 94
S. Ct. 1683, 1691–92 (1974).  Police
officers have a ‘broad range of duties and authority” and “must often act
swiftly and firmly.”  Id. at 246.  Moreover, “police officers . . . . routinely
make close decisions in the exercise of the broad authority that necessarily is
delegated to them” and “are subject to a plethora of rules ‘often so
voluminous, and ambiguous, and contradictory, and in such flux that officials
can only comply with or enforce them selectively.’”  Davis
v. Scherer, 468 U.S. 183, 196, 104 S. Ct. 3012, 3020 (U.S. 1984).






[7]           Since Telthorster,
the Texas Supreme Court has utilized this general standard in claims
against city council and zoning board members.  Joe, 145 S.W.3d at 164; Ballantyne, 144 S.W.3d
at 426.





[8]           The
fact that Sergeant Parker was the second vehicle behind the suspect, following
Lieutenant Webb, is disclosed in the deposition excerpt offered by the
Rodriguezes.  Neither party presented
evidence concerning the location of any of the rest of the “7 to 10” officers
involved in the surveillance.





[9]           The
evidence on the high traffic volume was submitted by the Rodriguezes.





[10]         Sergeant
Parker’s conclusion that “I can, and do, state that I acted in ‘good faith,’”
to the extent it expresses his subjective state of mind, is irrelevant to the objective
good faith inquiry.  Ballantyne, 144 S.W.3d at 427–28.